WOODMANSEE, J.
This action was brought by Fred Tuke, a tax-payer, on behalf of the city of Cincinnati, to enjoin the carrying out of a contract entered into by and between the city of Cincinnati, through its proper officers, and the defendant, J. M. Quill, for the laying of a wood block surface upon Eastern avenue in said city.
The petition sets out the different steps that were taken by the public officials of said city under which the contract was finally awarded to said Quill.
The petition contains a number of paragraphs taken from the specifications for the work with reference to wood blocks, the treatment thereof and the oil to be used, and it is alleged that ten bids were made for the work by various contractors, two by the defendant, Quill, one of which was a proposal to do the work for $62,348.50 and the other to do the work for $77,132.50.
*418 The petition further alleges that the proposal to do the work for the larger sum was wrongfully accepted by the city and a contract entered into to pay the said Quill the sum of $77,132.50 for making said improvement, which said contract is sought to be enjoined in this suit.
The questions involved in this proceeding are of such moment to the people of Cincinnati as well as to the parties to the suit that the court has been quite willing to give- all matters involved the largest range of investigation so that the result of the trial might be helpful in finding out the proper legal steps to be hereafter taken to secure for our city the best streets and a speedy construction of the work provided for under the contracts let.
Certainly no one could desire that a much needed public improvement should be delayed because a contract has been entered into that suggests a judicial construction before it is performed.
The extensive use of wood blocks for street paving is limited to recent years, although the value of treating wood with oil to preserve it has been known for many decades.
Cincinnati in the last four or five years has payed a number of streets with wood blocks and the investigation in this ease has brought the court’s attention to the extent of this new and growing industry as well as to its marvelous possibilities for the future.
The average man finds it almost beyond comprehension that in eomplance with the Cincinnati specifications and the usual specifications for like work that twenty pounds or more than two gallons of oil in quantity must be injected into every.cubic foot of timber used. This treatment is to destroy all the elements of decomposition that exists in the wood and is to fill all the pores; to make the blocks impervious to water and at the same time make it almost limitless in its capacity to endure both the ravages of time and the ordinary service to which it is put. Experience has suggested changes from time to time in the kind of oil to be used and the manner of treatment.
In this extended hearing the court has been impressed with the fact that this is largely a controversy between manufacturers of and dealers in oils. It may seem on the surface an effort to save money to the property owners along Eastern avenue, but when brought down to its last analysis it is a proceeding to find a *419 market for oils other than those required in the contract sought to be enjoined. The defendant Quill can hardly be said to be responsible for the situation in which he finds himself for he must necessarily negotiate with the oil man and as he can not do business with all of them in a single contract he is thereby brought into a controversy by the rivalry and difference of others.
The court’s observation has been that public contractors are not unlike other men. They naturally seek a contract on terms most advantageous to themselves, but the contractor who faithfully performs all the obligations of a contract which he has made with a municipality is entitled to be freed from the unjust criticism that is often directed at all public contractors. The contractor engaged in the paving of a street who willfully gives the community less than that which it has contracted for should be measured by the same standard as the grocer or the coal dealer who uses short weights or the merchant who knowingly sells an adulteration for the real thing.
It is made to appear that for reasons satisfactory to himself the defendant Quill made two bids for the contemplated wood block improvement in question. The specifications required that samples of oil should be furnished with each bid. This requirement -was complied with, a number one grade of oil becoming a part of the highest bid; a number two grade becoming a part of the lowest bid. The number two grade of oil was rejected by the director of public service, and said official stated in open court that the same was rejected upon the report of the city chemist to the effect that said oil did not come up to the requirements of the specifications — having an excess of three-fourths per cent, of free carbon, indicating the presence of tar or pitch; that the wood blocks treated with this oil would have a tendency to give up excretions of tar or pitch, especially in hot weather, which was in every way objectionable. To avoid this condition the director'of public service under the advice of the city chemist decided to construe the condition in the specifications that required an oil free from carbon to mean commercially free, and should be construed to mean not to have more than three-fourths per cent, thereof. The affidavits filed by-Quill are identical in terms, setting out that both oils were up to the requirements of the specifications. The chemical test, however', *420 indicated that the oil submitted with the lowest bid had 2.13 per cent, free carbon and for that reason the bid was not considered.
It was- urged at the beginning of this hearing by counsel for plaintiff that under either bid of Quill he would be required to build the street according to the specifications and therefore nothing but the lowest bid could be entertained.
This court holds that the oil submitted with the bid was a • part of the proposition; and when the proposition was accepted it meant the oil going with that proposition should or at least could be used by the contractor in making the improvement. If the lower bid had been accepted, the city through its proper officers being notified of the kind and quality óf oil to be used with that proposition would be- bound to allow the use of that grade of oil. However, if the city had not made the test and had accepted the lowest bid relying upon the representations of the bidder that the oil complied with the specifications, then the bidder could doubtless have been compelled to furnish such an oil, notwithstanding the gradé or the inferiority of the sample.
As there was some doubt among the bidders as to the amount of free carbon that would be allowed in the oil to be used and the amount of matter in suspension it is but natural that they would be at a loss to know just what grade and cost of oil they should submit with their bids. •
The specifications provide as follows:
“The blocks are to be thoroughly treated with a heavy or ‘dead’ oil of coal tar. - * * * The heavy dead oil of coal tar shall be free from carbon and shall contain not more than two and one-half per cent, of matter in suspension. The oil must be free from adulterations, it must be obtained wholly and entirely from coal tar and must not contain anjr oil derived from water gas tar, oil gas tar or other tars. ’ ’
The question arises as to what these terms mean. Experts have been called from New York, Chicago, Indianapolis and elsewhere and they do not agree. Unfortunately these experts have been called to testify in behalf of interested parties who compensate them, but it is to be regretted that there should be room for controversy about terms that are so vital to the letting of the contract. It is claimed by some that under these specifications the oil must be a distillate; that it must be entirely a distillate from *421 coal tar, obtained by distillation, while others insist that the oil may be made up partly by distillation and partly by the residue of distillation from coal tar.
It has been urged with some confidence by counsel for the defendant Quill that this court had no power to substitute its discretion in place of the discretion of the director of public service, whose duty it is to award the contract unless a case of fraud is made out. If this contention were true, then the case should not have been tried, for there is neither proof of fraud in the evidence nor is there allegation of it in the petition.
When Director Sundmaker came into office these bids in question had not been acted upon. His investigation according to his testimony had led him to believe that oils had been used in making other streets in Cincinnati that were not up to the required standard. It was then, under the advice of the city chemist, he decided that any oils submitted with bids as a sample that had more than three-fourths per cent, of free carbon would be rejected, as more than that amount of free carbon would be evidence of the mixture of oil and tar and proof that the sample was not a dead oil of coal tar required by the specifications.
This court would not undertake to put its discretion in place of. that of the director of public service. The court hokls that the director of public service was in the exercise of his rightful authority and discretion, but the court further finds that the bids that came to him.for the exercise of his discretion were charged with an infirmity that gives the court power to intervene. .
The specifications governing in the case and under which the bids were made were adopted in the year 1908. Practically all contracts for wood block streets in Cincinnati have been made under them. Those specifications require that the wood blocks were to be treated with dead oil of coal tar, free of carbon, twenty pounds to the cubic foot of timber. Contracts have been let upon bids submitted that called for an oil with two or even three per cent, of free carbon and therefore impliedly construing such an oil to be commercially free from carbon and meeting the specifications.
When the bids were taken for the contract in question in this case such a construction had been placed upon these specifications by other officials who were duly authorized, all of which was known to the bidders.
*422 If the oil with the greater per cent, of free carbon is less expensive than the oil without carbon, it is but natural that the bidders would submit with their proposition the oil that meant the less cost, giving them the inducement to make a lower bid with cheaper or inferior oils in the hope of getting a contract that carried with it a profit.
Before these oils were analyzed by the city chemist, the director of public service who came into office on January 1, 1910, after the'bids had been made, acting upon the information as already stated herein that had come to him from the city chemist and from other sources about the standard of oil that should be used, established the ruling referred to that there should not be to exceed three-fourths per cent, of free carbon in the oil.
This construction of the specifications seems justified and, if the information that thus came to the director of public service was correct, it would seem to the court that he acted wisely and for the best interests of the people of the city of Cincinnati who in the days to come may have many miles of streets made of wood blocks; that under this ruling the blocks must be treated with a high grade of oil to prevent excretions of tar or pitch that produces a condition on the thoroughfare that is dangerous to horses and is the source of tar that is tracked upon the sidewalks and into our homes.
The court would not make the observation if such an oil was not for sale upon the open market. The evidence discloses that the grade of oil which was furnished in the sample with the highest bid of the defendant Quill is for sale upon the open market, and many thousands of gallons of it have been imported into this country recently by one of the companies interested in this proceeding. It seems -that there is a wide open competition in the sale and manufacture of this oil, and the court ventures to say hat if the time should ever come that any oil required by the specifications falls into the control of a trust or monopoly, the director of public service in submitting his specifications could, exclude such oil even at the expense of having streets that are less perfect.
Having thus stated the underlyng principles that ought to govern in the letting of public contracts similar to the one in controversy, the court comes now to its decision relative to the issues involved in this case.
*423 Bids were made by parties who were advised of the previous interpretation of the specifications relative to free carbon. They bid and had a right to bid with those interpretations in mind, and they certainly did. Even the successful bidder anticipating the possibility of such a construction wisely submitted what is said to be the less expensive oil with one of his bids to be prepared for such a construction. Certainly eight of the bids were not made with reference to the new construction, because none of their samples of oil in any way complied with that construction of the specifications. There is no evidence that all of 'the bidders knew that the samples were to be put to the test of three-fourths per cent, of free carbon in the oil, and it is practically admitted that no public declaration was made of such intended interpretation before the bids or samples were submitted, and the court finds from th.e evidence that there is no uniform interpretation of said terms in the -trade.
The court therefore concludes that under the circumstances the highest bid should not have been accepted by the city, for the reason that the' element of unrestricted competive bidding is lacking in this particular transaction.
The court finds that there should have been either a readvertisement for bids upon the change of administration, with public notice of the new interpretation of the free from carbon clause, or the letting of the contract to Quill under the lowest bid.
The court is clear in the conclusion that the contract entered into under the highest bid should be enjoined, but the most difficult proposition in the case is as to whether or not the defendant Quill should be permitted to complete the work under the terms of his lowest bid as a basis of the contract.
It is claimed by counsel for defendant that in view of the fact that the city found that the bid to do the work for $77,132.50 to be the lowest and best bid, that it would be in the nature of a stultification now to find that the lower bid based upon an inferior quality of oil could be therefore the lowest and best bid.
It was not many years since that contracts of a public nature were by statute required to be awarded to -the “lowest” bidder. The statute as it now stands authorizes public officials to award the contract to the “lowest and best” bidder and there is much latitude given as to what that means in determining who is the *424 best bidder for the reason that the financial ability, the reputation and integrity of the bidder may be taken into account; but when it was determined by the director of public service that Quill was the best bidder he was certainly entitled to the same finding in that respect regardless of the amount of his bid. That finding determined Quill to be the best bidder and there is no controversy about the fact that his less bid was the lowest of all the ten bids that were filed. It is purely a matter of figures.
The only question now is whether the building of the street would be up to the required specifications. The court holds that the oil submitted with the bid is a part of the proposition and is necessarily the basis of any contract that might be entered into under it. In view of the fact that it has heretofore been held that an oil of like quality was up to the specifications and that streets have been built with blocks treated with such oil that have proved reasonably satisfactory, and in view of what seems to be the great necessity for the improvement in question, the court is of the opinion that the defendant Quill should have the option of proceeding to improve such street under his said bid.
The court does not claim the power to require either the city or the defendant Quill to enter into the said contract. The defendant Quill is given five days in which to determine whether or not he will undertake to enter into such a contract, failing in which the contract in question will be enjoined with a direction for a readvertising for bids for the improvement of Eastern avenue.
The court is gratified to note that the three-fourths per cent, free carbon clause has been incorporated into the specifications now in use, which will forever put at rest the controversy upon that point.
It would seem that the contractor who bids upon a wood block street improvement ought not to be at the mercy of the dealer in oil, but he ought to be able to go out into the open market and select an oil just as he would select stone or timber, and when he has submitted a sample of oil with his bid he ought to know by chemical tests made upon his own account that tiie sain pie which he submits is up to the specifications, the terms of which specifications are plain and clear and without question.
*425 With the advances that are being made in this growing method of public improvement changes in specifications will necessarily be suggested from time to time, and the court is convinced from the evidence in this case that the day is not far distant when the letting of a contract for wood block improvement, although involving complicated specifications, will not be unlike the letting of any other public contract. .